by representation in a like manner as though it was real estate; for this, it seems to us, is the purpose of the amendment of 1898.

The orders and decree should be affirmed, with costs. All concur.

---

AVILA et al. v. CITY OF NEW YORK.

(Supreme Court, Appellate Division, Second Department. June 29, 1905.)

1. CHARITABLE CORPORATIONS—DISSOLUTION—DISPOSITION OF PROPERTY.

The policy of the state during the period from 1867 to 1877, as evidenced by Laws 1867, p. 2223, c. 889; Laws 1870, p. 456, c. 175; Brooklyn City Charter 1873 (Laws 1873, p. 1290, c. 863); and by a later charter of that city—was to apply moneys received for liquor licenses granted, or for fines imposed, to the use of the locality in which they were collected, either directly or through the support of local benevolent or reformatory agencies. In furtherance of this policy, the Legislature, by Laws 1868, p. 995, c. 483; Laws 1871, p. 1080, c. 514; Laws 1872, p. 1640, c. 687; Laws 1875, p. 786, c. 627; and Laws 1877, p. 180, c. 169—appropriated a proportionate part of the excise money and in some cases the liquor fines collected in Kings county to the support of the Inebriates' Home for Kings County, which was created by Laws 1867, c. 843. These excise moneys and fines constituted the principal source of the home's revenue, and made up the fund from which the property of the home was purchased. *Held*, that it was competent for the Legislature, in dissolving the home in 1898, to direct that the proceeds of its property should be returned to the Kings county treasury, from which the fund which went into the purchase of such property was, in effect, diverted by the legislation providing for the support of the home.

2. PAYMENT—RECOVERY OF PAYMENTS—VOLUNTARY PAYMENTS.

Trustees of a dissolved charitable corporation, which had no creditors, and to the property of which no person claimed title by reversion, could not recover back the proceeds of the property of the corporation which they had voluntarily paid to the county treasurer in pursuance to the mandate of an alleged unconstitutional statute.

Appeal from Special Term, Kings County.

Action by Samuel A. Avila and others, as trustees for the Inebriates' Home of Kings County, against the city of New York. From a judgment dismissing the complaint, plaintiffs appeal. Affirmed.

The following is the opinion of Albert G. McDonald, Esq., referee:

By chapter 843, p. 2109, of the Laws of 1867, passed May 9th of that year, the Inebriates' Home for Kings County was created and incorporated with named incorporators, the powers and restrictions (except as there modified) of corporations created under the act for the incorporation of benevolent, charitable, scientific, and missionary societies, passed April 12, 1848 (Laws 1848, p. 447, c. 319), for the reformatory objects of receiving and retaining inebriates entering voluntarily or by force of law, and with the ordinary power of taking and disposing of real and personal property, and with authority to receive twelve per cent. of all excise moneys for licenses to residents of Kings county and all fines for violation of excise law in Kings county, to be applied to its founding and maintenance for the purposes stated; and it was enacted that persons committed for intoxication should be transferred to such home. By chapter 483, p. 995, of the Laws of 1868, there was appropriated to the uses of the institution $200,000 of the first moneys received for excise licenses in Kings county, and also annually $10,000 out of the excise money, besides all fines; and further provision was made for commitment of drunkards to the

home, and its president was required to report to the Legislature each year concerning its affairs. By chapter 514, p. 1080, of the Laws of 1871, it was enacted that out of the said $200,000 not less than $75,000 should be expended for erection of buildings and improving grounds, while the balance, together with any proceeds of sale of any of its land, should be invested, and the income used for maintaining the home. By chapter 687, p. 1640, of the Laws of 1872, the excise commissioner of Brooklyn and of Kings county towns were directed to pay to the home twelve per cent. of all money for licenses in Brooklyn or such towns, to be applied to its founding and support, together with all fines for intoxication or excise law violation in Brooklyn and Kings county. By chapter 627, p. 786, of the Laws of 1875, there was directed to be paid to the home twelve per cent. of all excise money for licenses in Brooklyn or Kings county to such extent only as was certified by the executive committee to be necessary for care and maintenance of indigent poor inebriates in the home, above available receipts from other sources, while the provision for fines was repealed, and there was further provision for transfer or commitment by magistrates to the home. By chapter 169, p. 180, of the Laws of 1877, it was enacted that the balance of such $200,000 and of the proceeds of any sale of lands should be expended and used, in whole or in part, for maintaining the home, and in erection, improvement, and furnishing of suitable buildings, or invested in securities, and the income used as the corporation deemed necessary; and the twelve per cent. allowance out of excise moneys was increased to fifteen per cent., with further provision for commitment by magistrates of drunkards to the home. During the period of these acts it was the policy and practice of the state to apply to the use of the locality, either directly or through the support and maintenance of local benevolent or reformatory agencies, whether under public or private control, moneys received for licenses granted or for fines imposed within the locality. This is illustrated by chapter 889, p. 2223, of the Laws of 1867, passed May 10, 1867, whereby it was enacted that from and after May 1, 1867, all sums received for licenses and fines in Brooklyn should be paid to the commissioners of the sinking fund of the city, or received in the towns of Kings county to the commissioners of schools for the benefit of the several and respective school districts, less the percentage then directed by law to be paid to the State Inebriates' Asylum, or any sum then directed by law to be paid to the said Inebriates' Home. And such policy and practice is further illustrated by the Brooklyn Charter of 1873, passed June 28, 1873 (Laws 1873, p. 1290, c. 863), whereby it was enacted that all moneys collected for licenses in Brooklyn should be for the benefit of the city, except the provision made by law to be paid to said Inebriates' Home; and by chapter 175, p. 456, of the Laws of 1870, the "Act regulating the sale of intoxicating liquors," by section 7 (page 458) of which the moneys arising from licenses in any town or village were to be deposited with the county treasurer, to be expended for the support of the poor, and the moneys in like manner arising in cities should be paid into the treasury of the city; and by later charter of Brooklyn, by the provisions of which twenty per cent. of all moneys for excise licenses or fines in Brooklyn was intercepted and taken for the police pension fund and ten per cent. for the orphan asylum societies and industrial schools of the city.

The state has thus exercised the right and recognized the propriety of spending the excise moneys in the locality for the support of the poor or other good public use, through public or quasi public agencies. And the provision made for and paid to the Inebriates' Home was thus, by interception, taken out of the treasury of Brooklyn or Kings county. Hence, in the disposition which the dissolution act of 1898 directed should be made of a portion of the proceeds of sale of the property of the home, in connection with which the $75,000 in question was paid to the county treasurer, it was sought to return back that much of the excise money which had been thus intercepted. The principal source from which the Inebriates' Home acquired property was the appropriation out of excise moneys. To some, but evidently a very much smaller, extent, it received money from voluntary patients. At the time of its dissolution it owned real estate and personal property; not merely its furniture, but also stocks and bonds and mortgages. All such property was sold by the trustees in dissolution, and from the proceeds all the debts of the institution were paid

and some $25,000 or $30,000 was divided among the trustees to their own use, and the $75,000 by them deposited with the county treasurer was the whole balance of proceeds remaining. While there is some vague suggestion respecting some gift or gifts to the institution, yet, according to the deeds put in evidence by its counsel, its real estate was purchased by it for valuable consideration, paid by it, and there is no definite evidence of any voluntary grant of real estate to it. The earliest of the deeds in evidence is dated June 30, 1868, and recorded August 24, 1868, subsequent to the receipt by it of a considerable sum from the excise moneys. A comparison of the deeds given by the trustees in liquidation on their sales of real estate shows that the property sold was the same the home had purchased for valuable consideration, and that it was not property which had been donated to the home by private persons to be held for its corporate purposes only, so long as its corporate life endured. Its stocks and bonds are said to have represented investments of surplus moneys, and its mortgages portions of the purchase price on its sales of real estate. The proceeds out of the sales in liquidation paid all claims against the institution; and, although several years have passed, no further demand of any kind has been made, either on behalf of any creditor or on behalf of any person claiming to be entitled in reversion, or on behalf of any person or corporation whatever.

The theory of the complaint is based on the assertion that the real property sold by the trustees in liquidation was donated to the home by private persons, to be held for its corporate purposes so long as its corporate life endured, and no longer, and that heirs and devisees of the donors are still in being, and that the greater part of the $75,000 paid to the county treasurer is proceeds of such real estate. But there is no definite evidence of any donation of any real estate to the home, or of the existence of any such heirs or devisees, or that any part of the $75,000 is proceeds of donated real estate. The trustees now claim that the act under which the $75,000 was paid to the county treasurer is unconstitutional, as being alleged to be violative of several recited constitutional provisions, and that the payment was made by the trustees under a mistake of fact on their part, in that they had no knowledge of the fact that the real estate was the donation of private persons, whose heirs and devisees were in being, and also under a mistake as to their right to make such a payment and as to the validity of the act in question, and that by reason of the alleged unconstitutionality of the act the payment to the county treasurer was a wrongful diversion of the trust funds of the home, so that it is plaintiffs' duties, as trustees, to recover back the moneys. In the final condition of the evidence there is a general statement of the existence of heirs of deceased incorporators of the institution, but a denial of any knowledge of the existence of any heirs or devisees of any grantors of its real estate. So there is no evidence of the existence either of any creditor, or of any person claiming or entitled to claim title by reversion.

Concerning the disposition of the surplus property of such an institution left after payment of its debts, there is no general statutory provision that we have been able to find. In 1872 the Legislature passed an act concerning the surplus property of certain religious corporations, whereby the state asserted the right to dispose of such surplus to such religious or charitable uses as should be petitioned for by the trustees of the institution, and approved by the Supreme Court. But we find no general statute relating to the surplus left in the present situation. It seems to be the law concerning the real estate of such an institution, at least such of its real estate as has been purchased by it for a valuable consideration, and concerning its personal property, that the surplus, after payment of its debts, passes to the state. There is necessarily a difference between the rules of law applicable to the disposition of the surplus property of such an institution as the Inebriates' Home, and the rules applicable in the case of a stock corporation or of a membership corporation, whose members were the contributors who created the fund. Many of the cases on behalf of the plaintiffs seem, therefore, inapplicable to this situation. The state, as we have seen, has always directed the disposition of money which came as the proceeds of liquor licenses or fines for excise violations to the benefit of the locality. And if the surplus of the proceeds of the property

of the Inebriates' Home, on its dissolution (and it is not questioned that the Legislature had a right to enact its dissolution), passed to the state, it was proper that the state should assert the right to dispose of it, and to dispose of it by returning it to the locality the treasury of which originally suffered the loss. These trustees voluntarily paid the $75,000 to the county treasurer, although now claiming that it was under a mistake. No one has asserted any claim to the fund. The trustees seek to obtain its possession and administration, not because any claim is asserted by any real or alleged cestui que trust, but because of the general rule that trustees in liquidation are administrators of the assets of a dissolved corporation, and should close up such administration by judicial accounting and decree. But the administration seems to have been completed, and the whole surplus to have gone where it should have gone, and no one is injured or complains.

The act in question does not seem to be unconstitutional. And even if on any ground it could have been regarded as unconstitutional, I do not think the present plaintiffs, under the circumstances of this case, are; or were when this action was brought, in the position to recover possession of any of the money paid by them to the county treasurer.

I have therefore decided that the complaint should be dismissed on the merits, with costs.

Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, JENKS, HOOKER, RICH, and MILLER, JJ.

Edward A. Alexander, for appellants.

John J. Delany, Corp. Counsel (James D. Bell and Richard B. Greenwood, of counsel), for respondent.

PER CURIAM. Judgment affirmed, with costs, on the opinion of Albert G. McDonald, Esq., referee.